THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STANWOOD BOOM WORKS, LLC, | § | |
| | § | |
| v. | § | C.A. No. 4:11-cv-00019 |
| | § | |
| BP EXPLORATION & PRODUCTION, INC. | § | |

**STANWOOD'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ON BP'S LIABILITY FOR BREACH OF CONTRACT**

This is a simple contract case. Stanwood[1] sells containment boom. BP wanted to buy containment boom. After much negotiation, BP sent Stanwood a written purchase order for 200,000 feet of boom. Stanwood accepted the purchase order and prepared the boom for delivery. But then, BP refused to accept or to pay for the boom. BP claimed instead that the written purchase order was not binding.

The crux of this dispute is whether the parties had an enforceable contract. The important facts are undisputed, and Stanwood's position is correct as a matter of law. Stanwood therefore moves for a partial summary judgment on the following issues:

(1) Stanwood and BP had a valid contract;

(2) Stanwood tendered performance under the contract;

(3) BP breached the contract; and

(4) Stanwood's claims are not barred by the statute of frauds.

---

[1] This motion will refer to Plaintiff Stanwood Boom Works, LLC as "Stanwood" and to Defendant BP Exploration & Production, Inc. as "BP."

1484.00001/470191.v1

## I. STATEMENT OF FACTS

Stanwood manufactures and sells containment boom.  Following the Deepwater Horizon explosion in April 2010, BP needed vast amounts of boom to respond to the oil spill.  This naturally led the parties to one another.

### *Stanwood and BP negotiate*

In May 2010, one of BP's suppliers began purchasing boom from Stanwood and reselling it to BP for use in the Gulf of Mexico.  BP became interested in cutting out the middleman and buying boom directly from Stanwood.  Likewise, Stanwood wanted BP to be a direct customer.  So the parties started talking.

Throughout June, the parties discussed technical details about Stanwood's boom.  (Exhibit 2).[2]  Stanwood shipped samples to Alabama for inspection by BP.  (Exhibit 4).  On July 2, after completing their tests, BP's technical team approved Stanwood's boom for use in controlling the Gulf oil spill.  (Exhibit 9 at SBW 000150).

The parties then negotiated commercial terms.  Stanwood's initial bid was for BP to purchase one million feet of 18-inch boom at $18 per foot.  (Exhibit 12 at SBW 000043).  BP countered, and the parties exchanged proposals in early July.  (Exhibit 14; Exhibit 15; Exhibit 17).  BP instructed Stanwood not to sell boom to any middlemen while the parties worked out the details of their agreement.  (Exhibit 13).  On July 9, Stanwood cancelled a pending sales contract with one of BP's suppliers and refunded more than $1 million that the supplier had already paid.  (Exhibit 25).

---

[2]   All exhibit citations refer to the Agreed Exhibit List, Docket No. 12, filed by the parties on April 8, 2011.

### *July 10: the original contract*
### *(Purchase Order BP-DIS-0022 Rev. 1)*

As the parties moved closer in negotiations, BP prepared a draft purchase order bearing the legend "BP-DIS-0022." (Exhibit 21). Stanwood requested several revisions. (Exhibit 26). Stanwood also told BP that its lender — from whom Stanwood might need financing — had asked for handwritten signatures on the purchase order. (Exhibit 31 at SBW 000245-46). BP agreed to have someone provide a handwritten signature even though the document had no signature block. (Exhibit 33 at SBW 000001).

On Saturday, July 10, BP's "Purchasing Specialist" Daniel Siddiqui emailed a revised purchase order labeled "BP-DIS-0022 Rev. 1." (*Id.* at SBW 000244, 000247). The purchase order called for BP to purchase 610,000 feet of boom at $15 per foot. (*Id.* at 000247-48). Mr. Siddiqui asked Stanwood to sign the purchase order and return the contract to BP for its signature. (*Id.* at SBW 000244). Minutes later, Stanwood emailed a signed copy of the purchase order. (*Id.*). The parties had a deal.

### *July 12: the new contract*
### *(Purchase Order BP-DIS-0022 Rev. 2)*

On Sunday, July 11, as Stanwood was making arrangements to deliver boom, BP suddenly requested a change to the parties' contract. BP's agents said that, upon further consideration, BP had determined that it may not need 610,000 feet of boom. BP only wanted to commit to purchasing 200,000 feet, and it wanted an option to buy the other 410,000 feet. After much discussion, both internally and with BP, Stanwood agreed to modify the parties' agreement.

On Monday, July 12, BP emailed a new purchase order labeled "BP-DIS-0022 Rev. 2." (Exhibit 33 at SBW 000003). In his cover email, Daniyal Siddiqui stated,

> Please see amended purchase order. Go ahead and sign it, get it back to me, I'll get it signed and we'll move on the 200k Inventory you already have.

(*Id.* at SBW 000001). Stanwood promptly returned a signed copy by email and noted that the original purchase order for 610,000 feet of boom had been rescinded. (*Id.*). The new purchase order, dated July 12 and labeled BP-DIS-0022 Rev. 2 (hereafter, the "Purchase Order"), was now the operative agreement.

### *BP caps the well and claims the purchase order is not a valid contract*

Later on July 12 — the same day that Stanwood signed the Purchase Order — BP installed a cap on the well. BP's tone quickly changed. The night of July 12, Daniyal Siddiqui sent an email asking Stanwood to submit a new bid for several boom products, including 200,000 feet of 18-inch boom. (Exhibit 36). The next morning, Stanwood told BP that it would bid on the new items, but the parties already had a contract for 200,000 feet of 18-inch boom. (Exhibit 38 at SBW 000818). Daniyal Siddiqui responded that the Purchase Order "is on Hold." (Exhibit 37).

Hoping to maintain a business relationship with BP, Stanwood tried to arrange a telephone conference. (Exhibit 39). BP declined. (Exhibit 40). Therefore, Stanwood sent BP a letter on July 17 setting forth its position:

> [W]e have completed manufacture of 200,000 feet of 18" product that is ready for shipment pursuant to PO # BP-DIS-0022 Rev. 2 Dated July 12, 2010.

4

> As you also know, the shipment per our agreed upon schedule has been held up by BP, as BP has not yet provided shipping or delivery instructions. Thus, we are unable to ship the product without hearing from BP on these items.
>
> As a result, we want to clarify that Stanwood Boom Works has fully performed under the contract, and we are simply waiting on BP to take the product and instruct on delivery. For the time being, we will continue to hold the product pending further delivery instructions.

(Exhibit 41 at SBW 000773).

BP responded to Stanwood's letter on July 21. Matt Pavlas, BP's "Lead, Critical Resources Containment Boom," wrote that:

> BP management was unable to obtain signature for approval of the purchase order in order to move forward. The subject purchase order is on hold.
>
> Stanwood Boom Works is an approved vendor, and as we move forward your services may be requested in the future. However, given our current demand for Oil Containment boom, all new purchase orders and extensions to existing orders are on hold.

(Exhibit 42 at SBW 000557).

Stanwood contacted BP several times after July 21 to request that BP honor its agreement. (Exhibit 43). Finally, on August 23, Michael Gracia — who had replaced Matt Pavlas as the "Lead, Critical Resources Containment Boom" — wrote to Stanwood. Curiously, BP's position had changed. Instead of claiming that the Purchase Order was "on hold," BP asserted that the agreement was not an "official contract" because no one from BP had signed it by hand:

> BP has furnished neither a signed copy of the purchase order, nor any sort of monetary down payment to SBW.

5

1484.00001/470191.v1

> It is BP's position that BP made an offer to SBW by issuing our Purchase Order. SBW did not accept the Purchase Order but rather insisted on modified terms and clearly indicated it would not perform without satisfaction of those supplemental terms. BP at no time accepted or adopted Stanwood's required supplemental terms and therefore, no contract was formed between our two companies. BP does not accept that it has any obligation to accept delivery or to pay for any product as a result of this failed transaction.
>
> BP would like to reiterate that SBW is still on our Approved vendor list, and would like to maintain a positive relationship with SBW. Please be aware that our need for containment boom may change in the future, and we would like to know that if and when there is a demand, that we can rely on SBW to supply BP with quality product at a reasonable cost. Thank you very much for your time and consideration.

(Exhibit 44 at SBW 000463).

Following its receipt of Mr. Gracia's letter, Stanwood retained counsel and filed this action. In accordance with the Court's instructions at the April 4, 2011 scheduling conference, Stanwood now moves for partial summary judgment on liability issues.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 576 (5th Cir. 2003). When resisting summary judgment, the non-movant may not rely upon conclusory statements, but rather "must designate specific facts showing there is a genuine issue for trial." *Zer-Ilan v. Frankford (In re CPDC, Inc.)*, 337 F.3d 436, 441 (5th Cir. 2003). If the non-movant fails to submit evidence that raises a fact question, summary judgment is proper. *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 494 (5th Cir. 1996).

6

### III.     ARGUMENTS & AUTHORITIES

**A.     Stanwood's claim for breach of contract is valid as a matter of law.**

The elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages resulting from the breach. *Smith Int'l, Inc. v. Egle Group, LLC,* 490 F.3d 380, 387 (5th Cir. 2007) (citing *Valero Mktg. & Supply Co. v. Kalama Int'l, L.L.C.,* 51 S.W.3d 345, 351 (Tex. App.—Houston [1st Dist.] 2001, no pet.)).  The summary judgment record establishes the first three elements as a matter of law.[3]

    1.     <u>The Purchase Order is a valid contract.</u>

The basic legal requirements for a contract are well-established.  There must be an offer, acceptance and consideration.  *Crook v. Zorn*, 95 F.2d 782, 783 (5th Cir. 1938); *see also Pasture Renovators, L.L.C. v. Lawson Cattle & Equip., Inc.*, 480 F. Supp. 2d 890, 893 (W.D. Tex. 2006).  The Purchase Order clearly satisfies these requirements.

    a.     *The Purchase Order is an offer.*

BP made an offer when it emailed the Purchase Order to Stanwood on July 12, 2010.  BP has conceded that fact.  (Exhibit 44 at SBW 000463 ("It is BP's position that BP made an offer to SBW by issuing our Purchase Order.")).

Moreover, BP's offer contained all of the terms necessary to create an enforceable contract.  *See, e.g.*, *APS Capital Corp. v. Mesa Air Group Inc.*, 580 F.3d 265, 272 (5th Cir. 2009) (an agreement must include all material terms to be binding).  The Purchase Order

---

[3]     If the Court grants this motion, the parties and the Court can discuss what discovery, if any, is needed to determine Stanwood's damages.

7

specified the buyer, seller, delivery schedule, freight terms, payment terms, quantity, price, and the technical details of the boom being purchased. (Exhibit 33 at SBW 000003). It also contained fourteen pages of "Terms and Conditions," which included (among other things):

- a merger clause (*Id.* at SBW 000007, § 2);

- a "time is of the essence" clause (*Id.* at SBW 000008, § 7);

- a force majeure clause (*Id.* at SBW 000008, § 8);

- detailed warranty provisions (*Id.* at SBW 000008, § 10);

- choice of law and forum provisions[4] (*Id.* at SBW 000010, §§ 13.02-13.05);

- a termination provision, which required BP to give Stanwood written notice five days before it could terminate the agreement (*Id.* at SBW 000013, § 22);

- indemnification provisions (*Id.* at SBW 000013-16, § 24);

- insurance requirements (*Id.* at SBW 000016-18, § 25);

- a delivery schedule for the 200,000 feet of boom that BP was purchasing (*Id.* at SBW 000019, § 30); and

- an option clause giving BP until July 22 to decide if it wanted to purchase another 410,000 feet of boom (*Id.* at SBW 000019, § 31).

As illustrated above, the Purchase Order contained all the essential terms of a sales contract. *Cf. Liberto v. D.F. Stauffer Biscuit Co., Inc.*, 441 F.3d 318, 324 (5th Cir. 2006) (Texas law generally requires that contracts specify the time of performance, the price to be paid, and the property to be transferred). BP thus made an enforceable offer when it sent the Purchase Order to Stanwood.

---

[4] The parties appear to agree that, in accordance with Section 13.03 of the Purchase Order, Texas law governs this dispute. *See, e.g.*, *Alphamate Commodity GMBH v. CHS Europe SA*, 627 F.3d 183, 187 (5th Cir. 2010) (a contract for the sale of goods is not controlled by maritime law).

b. *Stanwood accepted the offer.*

Exactly 30 minutes after BP emailed the Purchase Order to Stanwood, Stanwood returned a hand-signed copy of the agreement to BP. (Exhibit 33 at SBW 000001). That act confirmed Stanwood's acceptance of BP's offer.

Unless it unambiguously indicates otherwise, "'an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances.'" *South Hampton Co. v. Stinnes Corp.*, 733 F.2d 1108, 1119 (5th Cir. 1984) (quoting TEX. BUS. & COMM. CODE § 2.206(a)(1)). BP invited Stanwood to accept its offer by returning a signed copy of the Purchase Order. (Exhibit 33 at SBW 000001 ("Please see amended purchase order. Go ahead and sign it, get it back to me, I'll get it signed and we'll move on the 200k Inventory you already have."); *see also Fujimoto v. Rio Grande Pickle Co., Inc.*, 414 F.2d 648, 652 (5th Cir. 1969) ("The offeror can specify a mode of making an acceptance of his offer.") (quotation omitted). Stanwood did exactly what BP asked — it accepted the offer by sending BP a copy of the Purchase Order with the signature of its Chief Executive Officer. (*Id.* at SBW 000001, 000003). BP cannot question the reasonableness of the very manner of acceptance that it requested.

c. *The contract was supported by consideration.*

Stanwood promised to deliver 200,000 feet of 18-inch boom in exchange for BP's promise to pay $3 million. (Exhibit 33 at SBW 000003). That is textbook consideration. *See United States v. McBride*, 571 F. Supp. 596, 605-06 (S.D. Tex. 1983) ("[T]he well-established definition of consideration [is] a promise to act or forebear that is bargained for and exchanged for a return promise."). The Purchase Order is a valid contract.

9

### 2. Stanwood tendered performance.

The Purchase Order required Stanwood to make 200,000 feet of boom ready for delivery between July 12 and July 17. (Exhibit 33 at SBW 000003). Stanwood did just that. (Exhibit 41 ("[W]e have completed manufacture of 200,000 feet of 18" product that is ready for shipment . . .."); Exhibit 43 (enclosing photographs of the boom); Exhibit 44 at SBW 000465-66 (the photographs)).[5] Stanwood also attempted to ship the boom, but BP never provided delivery instructions. (Exhibit 41 ("[T]he shipment per our agreed upon schedule has been held up by BP, as BP has not yet provided shipping or delivery instructions."); Exhibit 43 ("Further, we are awaiting the shipment instructions . . ..")). BP's failure to provide shipping details excused Stanwood from further action. *Miller v. Hodges*, 260 S.W. 168, 172 (Tex. Civ. App.—Eastland 1924, judgm't adopted) ("It is a universal maxim that, where the obligation of a party depends upon a certain condition being performed, and the fulfillment of that condition is prevented by the act of the other party, the condition is considered as fulfilled."). Therefore, by producing the boom and asking for delivery instructions, Stanwood properly tendered performance.

### 3. BP breached the contract.

BP never paid the $3 million it owes. Instead, in its own words, "BP does not accept that it has any obligation to accept delivery or to pay for any product . . .." (Exhibit 44). Accordingly, the Court can determine BP's liability as a matter of law — there was a valid contract, Stanwood tendered its performance, and BP refused to perform.

---

[5] The photographs on pages SBW 000456-57 appear to have been erroneously included as part of Exhibit 44.

## B. Stanwood's claims are not barred by the statute of frauds.

BP has asserted one affirmative defense relating to its liability.[6] BP alleges that Stanwood's claims are barred by the statute of frauds. (Dkt. No. 9 at p. 7). BP is wrong.

Under the Uniform Commercial Code ("UCC"), a contract for the sale of goods exceeding $500 is generally not enforceable "unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker." TEX. BUS. COMM. CODE § 2.201(a). Moreover, a contract is not enforceable "beyond the quantity of goods shown in such writing." *Id.* In other words, as clarified by the comments to Section 2.201, there are "[o]nly three definite and invariable requirements" for satisfying the statute of frauds:

> First, [the writing] must evidence a contract for the sale of goods. Second, it must be "signed," a word which includes any authentication which identifies the party to be charged; and third, it must specify a quantity.

*Id.* § 2.201 cmt. 1; *see also Axelson, Inc. v. McEvoy-Willis*, 7 F.3d 1230, 1233 n.6 (5th Cir. 1993) ("The statute only requires (1) some writing sufficient to indicate that a contract for sale has been made, (2) a signature (in a loose sense), and (3) a quantity term.") (quotation omitted); *United Galvanizing, Inc. v. Imperial Zinc Corp.*, 2011 WL 11185, at *10 (S.D. Tex. Jan. 3, 2011) (same); *Int'l Metal Sales, Inc. v. Global Steel Corp.*, 2010 WL 1140218, at *9 (Tex. App.—Austin Mar. 24, 2010, pet. denied) (same).

---

[6] BP also pled an "affirmative defense" that "[t]he Complaint fails to state a claim upon which relief may be granted." (Dkt. No. 9 at p. 7). This is not an affirmative defense at all. It is simply a restatement of Federal Rule of Civil Procedure 12(b)(6).

There cannot be any legitimate dispute that the Purchase Order, which BP issued and intended to be an offer, is a writing sufficient to indicate that a contract for the sale of goods exists. *See supra* at 7-8. Nor can there be any question that the Purchase Order contains a quantity term. (Exhibit 33 at SBW 000003 (specifying a quantity of 200,000 feet of boom)). Presumably, therefore, BP's defense relies on the "signature" element. BP appears to contend that its refusal to place a *handwritten* signature on the Purchase Order renders the contract unenforceable under the UCC. (Exhibit 44 at SBW 000463).

BP has misread the statute. "[N]either the UCC's words nor purpose require a handwritten signature." *United Galvanizing*, 2011 WL 11185, at *10 (citing *Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289, 296 (7th Cir. 2002)). As Judge Posner explained,

> The purpose of the statute of frauds is to prevent a contracting party from creating a triable issue concerning the terms of the contract — or for that matter concerning whether a contract even exists — on the basis of his say-so alone. That purpose does not require a handwritten signature . . ..

*Cloud Corp.*, 314 F.3d at 296.

All the UCC requires for a signature is some symbol indicating that the party adopted the writing. TEX. BUS. COMM. CODE § 1.201(b)(37) (defining "signed"); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 134 ("The signature to a memorandum may be any symbol made or adopted with an intention, actual or apparent, to authenticate the writing as that of the signer."). "The symbol may be printed, stamped or written . . . It may be on any part of the document and in appropriate cases may be found in a billhead or letterhead." TEX. BUS. COMM. CODE § 1.201 cmt. 37. Thus, an e-mail can be a signature for purposes of the statute of frauds. *United Galvanizing*, 2011 WL 11185, at

*10. So can a printed document that "purported to be sent by [the defendant], identified specific employees, and provided [the defendant's] address and phone and fax numbers. *Int'l Metal Sales*, 2010 WL 1140218 at *9.

These legal principles confirm that BP signed the Purchase Order for purposes of the UCC. Daniyal Siddiqui's cover email authenticated and adopted the Purchase Order. (Exhibit 33 at SBW 000001 ("Please see amended purchase order. Go ahead and sign it, get it back to me, I'll get it signed . . .."); *compare United Galvanizing*, 2011 WL 11185, at *10. Likewise, the top section of the Purchase Order contained BP's logo, identified a specific employee at BP (Mr. Siddiqui), and provided BP's address and phone number:



**PURCHASE ORDER**

| Buyer: Daniyal Siddiqui<br>BP EXPLORATION & PRODUCTION INC.<br>501 WestLake Park Boulevard<br>Houston, Texas 77079<br>Telephone: 985-713-4870 | No. BP-DIS-0022    Rev. 2<br>Effective Date: 07/12/2010<br>SAP Project:Z4-0059V-E:BOOM<br>Paykey Number: ZKRAUMD252<br>Project Name: Spill Response |
|---|---|

(Exhibit 33 at SBW 000003); *compare Int'l Metal Sales*, 2010 WL 1140218 at *9. These markings constituted BP's signature under the statute of frauds.[7]

The Purchase Order satisfied all of the requirements set forth in TEX. BUS. COMM. CODE § 2.201. BP's affirmative defense fails as a matter of law. Stanwood respectfully requests, therefore, that the Court enter a partial summary judgment finding BP's liable for breaching the Purchase Order.

---

[7] Daniyal Siddiqui represented that BP would sign the Purchase Order. (Exhibit 33 at SBW 000001). Therefore, even if the UCC required a handwritten signature (which it does not), BP would be estopped from relying on the statute of frauds. *See "Moore" Burger, Inc. v. Phillips Petroleum Co.*, 492 S.W.2d 934, 937-938 (Tex. 1972) (estoppel bars one who falsely represented that he would sign a contract from later asserting a statute of frauds defense).

Dated:  May 3, 2011                         Respectfully submitted,

              By: /s/ Alistair B. Dawson
                Alistair B. Dawson
                adawson@brsfirm.com
                State Bar No. 05596100
                Federal ID No. 12864
                Matthew P. Whitley
                mwhitley@brsfirm.com
                State Bar No. 24037703
                Federal ID No. 33589
            BECK, REDDEN & SECREST, L.L.P.
            1221 McKinney, Suite 4500
            Houston, Texas  77010-2010
            (713) 951-3700 (Phone)
            (713) 951-3720 (Fax)

            ATTORNEYS FOR PLAINTIFF
            STANWOOD BOOM WORKS, LLC

**OF COUNSEL**

Owen J. Rarric
orarric@kwgd.com
Ohio State Bar No. 0075367
Krugliak, Wilkins, Griffiths & Dougherty Co., L.P.A.
4775 Munson Street NW
P.O. Box 36963
Canton, Ohio  44735-6963
(330) 497-0700 (Phone)
(330) 497-4020 (Fax)

## CERTIFICATE OF SERVICE

  I certify that the foregoing document was served on all counsel of record in compliance with the Federal Rules of Civil Procedure on May 3, 2011.

              By: /s/ Alistair B. Dawson
                Alistair B. Dawson

1484.00001/470191.v1