**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| STANWOOD BOOM WORKS, LLC, | § | |
| | § | |
| v. | § | C.A. No. 4:11-cv-00019 |
| | § | |
| BP EXPLORATION & PRODUCTION, INC. | § | |

**BP EXPLORATION & PRODUCTION, INC.'S RESPONSE TO STANWOOD'S
MOTION FOR PARTIAL SUMMARY JUDGMENT ON BP'S LIABILITY FOR
BREACH OF CONTRACT AND CROSS-MOTION FOR SUMMARY JUDGMENT**

In Stanwood's Motion for Partial Summary Judgment, Stanwood seeks summary judgment on the issue of whether the parties had a valid contract. Though Stanwood asserts the "important facts are undisputed" (Pl's Mot. for Sum. J. at 1), Stanwood selectively chooses facts from the record to conceal the reality that there was no valid contract between the parties.

After BP sent Stanwood a draft purchase order on July 8, 2010, Stanwood requested revisions to that purchase order and the parties began negotiating the terms. Significantly, Stanwood required BP to sign the contract before it could become valid—a requirement that was reiterated by both parties even after BP sent the draft purchase orders to Stanwood. Stanwood told BP that "the executed/signed copy serves as our consideration…otherwise we will have to require money down."[1] Stanwood fully understood that the final purchase order sent to Stanwood before the negotiations ceased could not become a valid contract upon Stanwood's signature, alone. In fact, after Stanwood sent BP the signed purchase order, they asked BP whether the contract was "valid."[2] BP immediately responded it was "on hold."[3] When BP did

---

[1]  Ex. 29 (ellipsis in original).
[2]  Ex. 37.
[3]  *Id.*

not approve the purchase order a few days later, Stanwood, for the first time, referred to its signed purchase order as a valid and binding contract.

The undisputed facts in this case support that as a matter of law, there was no valid contract.  Further, because both parties intended that BP sign the purchase order for it to become effective, Stanwood's breach of contract claim is barred by the statute of frauds.  Stanwood's claim for promissory estoppel also fails because the undisputed facts demonstrate Stanwood fully understood they were in a business negotiation and no guarantees were made.

BP therefore files this Motion in Response to Stanwood's Motion for Partial Summary Judgment.  In addition, BP files this Cross-Motion for Summary Judgment on the following grounds, (i) Stanwood's breach of contract claim fails as a matter of law because the purchase order was not a valid contract, (ii) Stanwood's breach of contract claim is barred by the statute of frauds, and (iii) Stanwood's promissory estoppel claim fails as a matter of law—and respectfully requests that the Court dismiss all causes of action against BP.

## STATEMENT OF FACTS

In June, 2010, BP Exploration & Production, Inc. ("BP") began negotiating with Stanwood Boom Works, LLC ("Stanwood") for the potential purchase of containment boom.[4] Throughout June, BP inspected and assessed Stanwood's manufacturing processes as well as its containment boom.[5]

During BP's inspection and assessment of Stanwood, BP noted that Stanwood's boom did not comply with BP's typical boom requirements.  On July 1, 2010, Stanwood applied for a

---

[4]   Stanwood makes several unsupported assertions in its Motion for Partial Summary Judgment ("Pl's Mot. for Sum. J."), including assertions regarding BP's motives for potentially purchasing boom from Stanwood. *See id.* at 2.  Stanwood's assertions about BP's purported motives in this regard are not only unsupported by any citations to the factual record, but are furthermore irrelevant to determine with a valid contract existed.

[5]   Exs. 1, 2, 3, 4 & 5.  All exhibit citations in this Motion refer to the Agreed Exhibit List [Dkt. No. 12] filed by the parties on April 8, 2011.  The Agreed Exhibit List further contains full versions of all the exhibits cited therein.  [*See* Dkt. Nos. 12-14.]  All documents referred to and cited in this Motion are included in the Agreed Exhibit List and are incorporated in their entirety herein.

"Deviation Request"—a request for BP to make an exception to its requirements.[6]  Stanwood understood at this time that BP had not committed to entering into a contract with Stanwood, but BP's approval of the deviation was necessary for any contract to be negotiated and signed by BP:

> Hopefully, we receive the approved deviation tonight or tomorrow so that I can contact Michael or you over the weekend on a contract/PO *if BP so desires to do business with SBW*.  In the meantime, *we will take the business risk* of producing boom at 12.5K feet a day in anticipation of a BP direct relationship.[7]

On July 2, 2010, BP approved Stanwood's "Deviation Request," a necessary prerequisite for BP to negotiate any potential contracts.[8]  As detailed below, contract negotiations occurred between BP and Stanwood, but those negotiations failed and no contract was ever entered into.

### A.      BP And Stanwood Enter Into Negotiations.

On July 2, 2010, Stanwood sent BP its pricing and production capabilities.[9]  On July 5, 2010, BP replied asking Stanwood to "come down on the price per foot" because BP was "averaging 14-16 dollars per foot" as compared with Stanwood's quote for $18 per foot.[10]  After a phone call between the parties, Stanwood asked BP to "[p]lease send *a draft contract* to my email so that we may review and provide quote early this afternoon."[11]

Later that day, even though BP had not yet provided a draft contract, Stanwood sent another quote to BP reflecting Stanwood's understanding that the two parties were still in negotiations:

> As discussed earlier today, enclosed please find the quote with required pricing, capacity and deliverables of 1MM feet of oil boom *that will assist your team in presenting the business case to your leadership team for approval*.[12]

---

[6]    Ex. 7.
[7]    Ex. 8.
[8]    Ex. 9.
[9]    Ex. 10.
[10]   *Id.*
[11]   Ex. 11.
[12]   Ex. 12.

3

Over the next two days, Stanwood and BP continued to negotiate on price in addition to several other "[t]erms to be discussed further."[13]

**B.      Stanwood States It Will Not Take Any Additional Steps Without A Purchase Order And BP Informs Stanwood It Is Reviewing The Terms Of A Potential Deal.**

On July 7, 2010, Stanwood communicated to BP that "[w]e must have the PO in the AM for review, confirmation and action.   We cannot take any additional steps in capacity, raw material procurement or equipment/production investments until PO is received."[14]   The next morning, Stanwood reiterated "[t]here is much to do on our end that is in a 'hold pattern' until the formal PO is in hand."[15]   Daniyal Siddiqui, a BP Purchasing Specialist, responded later that day, "We are still trying to get approval from our Senior management Jeff."[16]

**C.      BP And Stanwood Negotiate The Terms Of A Potential Purchase Order.**

On July 8, 2010, BP sent a draft purchase order to Stanwood, titled "BP-DIS-0-22."[17] Stanwood immediately replied, "We will print, review and get back to you tonight."[18]   Three hours later Stanwood sent BP an e-mail seeking "a conference call between our teams in the mid to late morning 11AM EST [on July 9, 2010] to discuss the terms and conditions of the PO."[19] Internally, Stanwood began discussing the terms they wanted to change in the purchase order, including the warranty on product, the cancellation concerns, the penalty fee, the assignment

---

[13]   Ex. 16.   In Pl's Mot. for Sum. J., Stanwood asserts that "BP instructed Stanwood not to sell boom to any middlemen while the parties worked out the details of their agreement."   *Id.* at 2.   The only evidence Plaintiff cites, however, is an ***internal Stanwood e-mail*** reflecting Stanwood's ***proposed*** communications to other customers about other potential boom sales.   *See* Ex. 13.   While this communication is insufficient to prove any motives on the part of BP, it does demonstrate that Stanwood understood that like all business negotiations, the negotiations with BP may not result in a signed contract.   *Id.*   Indeed, in response to Jeff Sponseller's proposed language, Jeff Dimos responded, "Like the language…wait till tomorrow ***to see results with BP***."   *Id.*

[14]   Ex. 17.

[15]   Ex. 18.

[16]   Ex. 19.

[17]   Ex. 21.   Stanwood concedes that this purchase order was indeed a "draft" and not a final contract.   *See* Pl's Mot. for Sum. J. at 3.

[18]   Ex. 22.

[19]   Ex. 23.

language, the delivery schedule and the renewal portion.[20]  Stanwood communicated these and other revisions to BP on the afternoon of July 9th.[21]  As a result of Stanwood's requested changes, BP informed Stanwood that the purchase order was "back in the approval tunnel" and that BP was "in a holding pattern until it comes out."[22]

### D.   Stanwood Requires Additional Revisions To The Terms Of The Purchase Order, Including Requiring BP's Signature On The Purchase Order.

The next day, Stanwood sent BP additional revisions to the terms of the purchase order, including a ***requirement that BP sign the purchase order*** in order to have a valid contract:

> Our confirmed understanding of what we are to receive today from BP:
>
> 1) Final BP Executed/Signed PO with changes to delivery schedule and terms and conditions discussed on conference calls yesterday with Donald May and you. ***Daniyal the executed/signed copy serves as our consideration…otherwise we will have to require money down.***
>
> 2) Warranty Letter Stating that Stanwood Boom Works is making the oil boom to BP's specs and with BP certified materials contained in Revision F.  BP acknowledges that Stanwood Boom Works cannot anticipate nor control the many different conditions under which our products may be used.
>
> 3) Permission letter allowing rights to be assigned, except for manufacturing of the oil boom, under the PO or contract primarily for financing reasons.[23]

Stanwood also told BP they would not begin working on boom production until a copy of the purchase order <u>signed by BP</u> was returned to Stanwood.[24]

### E.   BP And Stanwood Continue To Negotiate The Purchase Order Terms, And BP Explicitly States Stanwood Must Sign <u>Before</u> BP Will Sign The Contract.

On July 10, 2010, after receiving Stanwood's new conditions, BP sent a revised draft purchase order to Stanwood, titled "BP-DIS-0022 Rev. 1," noting that approval from BP would

---

[20]   Ex. 24.
[21]   Exs. 26 & 27.
[22]   Ex. 28.
[23]   Ex. 29 (emphasis added).
[24]   Ex. 44.

not take place until after Stanwood signed the contract.[25]   Stanwood fully understood this condition:  "Attached is the signed PO…***we will await your signature Monday morning***."[26]  The following day Stanwood reaffirmed this understanding:  "I tried calling to confirm receipt of the PO above last night…I know you are both busy just want to ensure that you have first thing Monday morning for signatures so that we can start arranging shipment immediately."[27]

On July 12, 2010, BP sent a revised purchase order to Stanwood with revised terms.[28]  Given the revised terms and continued negotiations, BP again highlighted that they would sign the purchase order <u>after</u> Stanwood approved and signed the purchase order.[29]  Again, Stanwood understood this, and even though Stanwood signed the purchase order, Stanwood stood by their own requirement that an executed version <u>by BP</u>—serving as "consideration" in place of a down payment—was required for the contract to become effective:  "***We will need this signed as you noted below by BP and returned to us to release shipment of the product today***."[30]  Stanwood's internal e-mails further reflect that they knew they were still in the negotiation phase with BP.[31]

That same day, Stanwood responded to a separate request for quote BP sent to various suppliers, including Stanwood, seeking quotes for a different type of boom than was the subject of the purchase orders.  In its response, Stanwood specifically asked BP, "To be clear, is our purchase order BP-DIS-0022 signed and emailed 7/12 valid?"[32]  The next day, on July 13, 2010, Daniyal Siddiqui responded, informing Stanwood the purchase order was "on hold" because he

---

[25]   Ex. 31.
[26]   *Id.*
[27]   Ex. 32.
[28]   Ex. 33.
[29]   *Id.*
[30]   *Id.*
[31]   Ex. 34 ("To be fair to SBW EE's, should we announce tomorrow that BP has informed us they want to renegotiate the contract and we may need to stop production (after 200K) until the contract is finalized?"); Ex. 35 ("BP is playing the negotiation game again….This revised PO was supposed to be signed and returned immediately with shipments starting today or tomorrow.  We have not received this yet.").
[32]   Ex. 37.

was "unable to get the appropriate signatures from BP to continue forward."[33]  BP never signed

the purchase order per BP and Stanwood's requirements.[34]  Four days later, Stanwood—for the

first time—referred to the unsigned purchase order as a valid and binding contract.

## ARGUMENT

Stanwood asserts two claims: (i) breach of contract and (ii) promissory estoppel.  In its

Motion for Partial Summary Judgment, Stanwood only seeks summary judgment on its breach of

contract claim.  BP, however, seeks summary judgment on both claims.  Summary judgment is

proper under Fed. R. Civ. P. 56(a) "if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."[35]  The question here is

one of law, namely whether a valid contract existed.  Because the undisputed facts demonstrate

that no valid contract existed, Stanwood's claims must be dismissed.

## I.  STANWOOD'S BREACH OF CONTRACT CLAIM FAILS AS A MATTER OF LAW.

Stanwood's breach of contract claim fails as a matter of law because there was no valid

contract.  Both parties explicitly put a condition on acceptance—which served as Stanwood's

"consideration"—that BP sign the contract.  Because there was clear intent by both parties that

BP's signature was needed to execute the contract, the statute of frauds also bars Stanwood's

breach of contract claim.

### A.  The Purchase Order Was Not A Valid Contract.

"Texas courts have stated that a valid and binding contract is formed by: (1) an offer, (2)

an acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4)

---

[33]  *Id.*

[34]  Again, Plaintiffs make several assertions regarding BP's motivations for revising the terms of the draft purchase
order.  *See* Pl's Mot. for Sum. J. at 4.  These assertions, however, are unsupported by any citations to factual
evidence and are irrelevant to determine whether a valid contract existed between the parties.

[35]  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding." *J.D. Fields & Co. v. United States Steel Int'l, Inc.*, 690 F. Supp. 2d 487, 497 (S.D. Tex. 2009), *citing Critchfield v. Smith*, 151 S.W.3d 225, 233 (Tex. App.—Tyler 2004, pet. denied).   "Consideration is also a fundamental element of a valid contract." *Ambulatory Infusion Therapy Specialists, Inc. v. UniCare Life and Health Ins. Co.*, No. H-06-1857, 2007 WL 1520994, at *2 (S.D. Tex. May 22, 2007).   "[I]n considering whether a contract has been formed a court must place itself as nearly as possible in the position of the parties at the time of their negotiations." *Kurio v. United States*, 429 F. Supp. 42, 46 (S.D. Tex. 1970).   The undisputed facts in this case demonstrate that as a matter of law, there was no valid contract.

### 1.      The Purchase Order Sent On July 12, 2010 Was Not An Offer.

The purchase order sent on July 12, 2010 was not an offer because Stanwood's signature, alone, could not create a binding contract.   "An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it."   Restatement (Second) of Contracts § 24 (1981).   In other words, an offer must reasonably appear that assent is all that is needed to ripen the offer into a contract.   *See Crest Ridge Constr. Group, Inc. v. Newcourt Inc.*, 78 F.3d 146, 153 (5th Cir. 1996).   "The mere submission of a proposal does not create any contractual obligation on the part of either party." *Pair-A-Dice Acquisition Partners, Inc. v. City of Galveston, Texas*, No. 02-40380, 2002 WL 31845288, at *1 (5th Cir. Dec. 11, 2002).   Here, neither BP nor Stanwood intended Stanwood's signature on the July 12, 2010 purchase order to create a binding contract.

After Stanwood unambiguously rejected BP's draft purchase order dated July 8, 2010 and insisted on revised terms,[36] the parties entered into further negotiations.[37]   Significantly,

---

[36]   Plaintiff has conceded that due to Stanwood's rejection, regardless of whether the July 8, 2010 purchase order was an "offer," it cannot be construed to be a valid contract.   *See CRSS Inc. v. Runion*, 992 S.W.2d 1, 5 (Tex.

Stanwood required as part of any final purchase order that BP would provide an executed copy or money down to serve as the consideration for the contract.[38]   Tellingly, Stanwood ignores this fact in its Motion for Partial Summary Judgment.   Stanwood argues, instead, that BP has "conceded" that it made an offer to Stanwood when BP sent the purchase order, citing a letter sent by BP in August 2010.  (*See* Pl's Mot. for Sum. J. at 7.)  This letter, however, confirms that after receiving the draft purchase order, Stanwood "insisted on modified terms and clearly indicated that it would not perform without satisfaction of those supplemental terms."[39]

During the negotiations regarding these modified terms, Daniyal Siddiqui served as Stanwood's primary BP contact.  But, as Stanwood was well aware, Mr. Siddiqui needed to obtain approval from BP management not only for any revisions, but also to execute the final agreed-upon contract.[40]   Mr. Siddiqui informed Stanwood that BP would not execute any contract until Stanwood agreed to and executed its final terms first.[41]   Upon Stanwood's agreement, BP management would then review and determine whether to execute the contract.[42]

The revisions to the original July 8th purchase order were a result of the continued negotiations between the parties, and not offers that could become binding should Stanwood, alone, sign the purchase order.  *See Axelson, Inc. v. McEvoy-Willis*, 7 F.3d 1230, 1233 (5th Cir. 1993) (holding that under Texas law, price quotation requiring seller to accept order could not be an offer, but only an invitation for an offer).  Stanwood's internal communications reflect that

---

App. —Houston [1st Dist.] 1995, pet. denied) (an acceptance that is not identical to the offer or that modifies a term of the offer is not an acceptance, but a counteroffer).

[37]   Ex. 24; *see also supra* Statement of Facts, Secs. C through E

[38]   *See supra* Statement of Facts, Sec. D.

[39]   Ex. 44.

[40]   *See* Ex. 20 (D. Siddiqui e-mail to Stanwood:  "We are still trying to get approval from our Senior Management Jeff"); Ex. 21 (Stanwood e-mail to BP:  "We understand the PO to be in leadership/senior management review."); Ex. 28 (D. Siddiqui e-mail to Stanwood:  "PO is back in the approval tunnel.  Am in holding pattern until it comes out").

[41]   *See supra* Statement of Facts, Sec. E.

[42]   *See* Exs. 28, 31 & 33.

*after* BP sent the draft revised purchase order, Stanwood acknowledged, "BP has informed us they want to renegotiate…" and "we are in the negotiation sandbox again."[43]

### 2. Stanwood's Signature Could Not Serve As Acceptance Because BP Conditioned The Purported Offer On BP Signing The Purchase Order After Stanwood Agreed To The Terms.

Even if this Court determines that the July 12, 2010 purchase order was an offer, both BP and Stanwood put a condition on acceptance—that BP execute the contract for it to become valid. As a general principle of common law, the offeror "is the master of his offer" and has the power "to impose conditions on acceptance of an offer, specify the manner of acceptance, or withdraw the offer before the offeree has effectively exercised the power of acceptance." *Cantu v. Cent. Educ. Agency*, 884 S.W.2d 565, 566 (Tex. App.—Austin 1994, no writ).

Further, "if either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are assented to or until the whole has been reduced to another written form, the preliminary negotiations and agreements do not constitute a contract." Restatement (Second) of Contracts § 27 cmt. b (1981); *Roberts v. Clark*, 188 S.W.3d 204, 212 (Tex. App.—Tyler 2002, pet. denied) ("When a promise is subject to a condition precedent, there is no liability or obligation on the promisor and there can be no breach of the contract by him until and unless such condition or contingency is performed or occurs"); *see also RHS Interests Inc. v. 2727 Kirby Ltd.*, 994 S.W.2d 895, 897-99 (Tex. App.—Houston [1st Dist.] 1999, no pet.) (holding there was no contract for purchase of property where buyer stated its written offer was "not binding as an agreement unless and until a fully executed Earnest Money contract is signed," but even under buyer's position that subsequent oral negotiations replaced this offer, no contract was formed because seller's response indicated deal would consummate only by "execution of the binding Purchase and Sale

---

[43] Exs. 34 & 35.

Agreement"); *WTG Gas Processing, L.P. v. ConocoPhillips Co.*, 309 S.W.3d 635, 646 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (holding there was no contract where "WTG knew that ConocoPhillips, at least, had no intent to be bound absent execution of a PSA").

Stanwood explicitly required BP to execute the contract—"Final BP Executed/Signed PO…Daniyal the executed/signed copy serves as our consideration…otherwise we will have to require money down".[44] BP also put a condition on acceptance—explicitly telling Stanwood that final approval by BP would not take place until <u>after</u> Stanwood signed the contract:

- "Please sign this copy and get it back to me for Delegation of Authority Approval which will happen Monday."[45]

- "Please see amended purchase order.  Go ahead and sign it, get it back to me, I'll get it signed and we'll move on the 200K Inventory you already have."[46]

Stanwood argues that it accepted the offer because "Stanwood did exactly what BP asked—it accepted the offer by sending BP a copy of the Purchase Order with the signature of its Chief Executive Officer."  (Pl's Mot. for Sum. J. at 9.)  Stanwood, however, fails to address the condition on acceptance even though earlier in its Motion, Stanwood conceded its awareness that the condition existed:  "Mr. Siddiqui asked Stanwood to sign the purchase order and return the contract to BP for its signature."  (Pl's Mot. for Sum. J. at 3.)

Stanwood further repeatedly indicated *after* signing the purchase order that they required BP's signature for the contract to become effective:

- "Attached is the signed PO….we will await your signature Monday morning."[47]

- "I tried calling to confirm receipt of the PO above last night…I know you are both busy just want to ensure that you have first thing Monday morning for signatures so that we can start arranging shipment immediately."[48]

---

[44] Ex. 29; *see also supra* Statement of Facts, Sec. D.
[45] Ex. 31.
[46] Ex. 33.
[47] Ex. 31.
[48] Ex. 32.

- "We will need this signed as you noted below by BP and returned to us to release shipment of the product today."[49]

In short, neither party intended to be bound by the terms of any purchase order until BP executed the contract—a condition on acceptance that BP required and Stanwood fully understood. Stanwood's signature, alone, could not create a binding and enforceable contract.

### 3. The Contract Also Fails Because It Was Not Supported By The Agreed-Upon Consideration.

Finally, the purchase order is not a valid contract because it was not supported by the agreed-upon consideration. "[W]here no other consideration is shown, mutual obligations by the parties to the agreement will furnish a sufficient consideration to constitute a binding contract." *Tex. Gas Utilities Co. v. Barrett*, 460 S.W.2d 409, 412 (Tex. 1970) (citation omitted). In this case the parties bargained for and agreed upon the consideration for the potential purchase order—that BP execute the agreement or provide money down.[50] Although BP did neither, Stanwood argues that the purchase order was "supported by consideration" because "Stanwood promised to deliver 200,000 feet of 18-inch boom in exchange for BP's promise to pay $3 million." (Pl's Mot. for Sum. J. at 9.) This argument is incomplete because Plaintiff again fails to address the agreed-upon consideration for the contract (*see id.*). Indeed, as a result of this agreed-upon consideration, absent BP's signature or money down (neither of which BP provided), Stanwood's signature alone could not and did not bind the parties to any obligations.

### B. Stanwood's Breach Of Contract Claim Is Barred By The Statute Of Frauds.

Stanwood's breach of contract claim also fails for the independent reason that it violates the statute of frauds. "The question of whether a written contract must be signed to be binding is a question of the parties' intent." *Perez v. Lemarroy*, 592 F. Supp. 2d 924, 930 (S.D. Tex. 2008).

---

[49] Ex. 33.
[50] Ex. 29; *see also supra* Statement of Facts, Sec. D. & Sec. I.A.2.

If there is "evidence of an intent to require <u>both signatures</u> as a condition precedent to [the contract] becoming effective," then signatures by <u>both parties</u> are required to form a valid contract. *Id.*[51] The undisputed facts in this case leave no question that both parties intended for BP to sign the contract in order for it to become effective.[52]

Plaintiff raises two arguments in support of its assertion that "BP signed the Purchase Order for purposes of the UCC." (Pl's Mot. for Sum. J. at 13.)  First, Plaintiff claims that "Daniyal Siddiqui's cover email authenticated and adopted the Purchase Order," citing *United Galvanizing, Inc. v. Imperial Zinc Corp.*, No. H-08-0551, 2011 WL 11185, at *10 (S.D. Tex. Jan. 3, 2011).  In *United Galvanizing*, the court found that an exchange of e-mails for the purchase of zinc metal was sufficient to create a binding contract because the e-mails stated a quantity of goods and allowed the court to infer an agreement had been reached. *Id.*[53]

*United Galvanizing*, however, is distinguishable from this case for two reasons.  First, there was no assertion or indication in *United Galvanizing*—as is present in this case—that either party intended <u>both parties</u> to sign the agreement before it could become effective.  Here, not only does the e-mail cited by Stanwood refer to the need to obtain BP's signatures after Stanwood signed the agreement, but the communications between the parties after this e-mail further reflect this requirement.[54]  Second, the *United Galvanizing* court found persuasive in its

---

[51]   *See also Scaife v. Associated Air Ctr. Inc.*, 100 F.3d 406, 411 (5th Cir. 1996) ("If parties negotiating a contract intend that the contract shall be reduced to writing and signed by the parties,…then either party may withdraw at any time before the written agreement is drawn up and signed by both parties") (citations omitted); *Simmons & Simmons Constr. Co. v. Rea*, 286 S.W.2d 415, 419 (Tex. 1955) (A written instrument will be held to be an <u>invalid</u> contract "where one of the parties intended that signing by both parties should be a condition of his assent thereto and there has been no acceptance, but instead a positive rejection, after one party has signed").

[52]   *See supra* Statement of Facts Sec. D & Sec. I.A.2.

[53]   Specifically, the Court noted that after the two parties had a lunch meeting, the buyer sent an e-mail requesting "a load of the zinc metal we discussed at lunch the other day," and the seller responded, "I will call am tomorrow and get a ship date for you.  Thank you for the business." *Id.*

[54]   Exs. 33, 35 & 37.

13

ruling the fact that the purchaser accepted and used a portion of the zinc metal that was the subject of the e-mail agreement. *Id.*, at *10. Here, BP never accepted any boom from Stanwood.

Next, Plaintiff claims, citing *Int'l Metal Sales, Inc. v. Global Steel Corp.*, No. 03-07-00174-CV, 2010 WL 1140218, at *9 (Tex. App.—Austin Mar. 24, 2010, pet. denied), that because "the top section of the Purchase Order contained BP's logo, identified a specific employee at BP (Mr. Siddiqui), and provided BP's address and phone number…[those] markings constituted BP's signature." (Pl's Mot. for Sum. J. at 13.)

In *Int'l Metal Sales*, the court analyzed whether a forum-selection clause could be enforced where the clause was included in the invoices but not the purchase orders. The court ultimately held that forum selection clauses could not be enforced because the invoices were not "acceptances" that formed part of the sales contract. *Id.*, at *6. The court found that the contract was formed before the invoices were sent—as evidenced by the initial fax including the quote, the purchase order form, and the release form sent after receipt of the purchase order. *Id.*, at *9.

Like *Union Galvanizing*, *Int'l Metal Sales* is distinguishable from the instant case because there was no assertion or indication that either party intended both parties to sign the purchase orders before they could become binding contracts. Further, the court analyzed this transaction in light of the fact that the parties had completed over 200 such deals in three years, all following the same general course of conduct. *Id.*, at *10. Thus, *Int'l Metal Sales* is not persuasive here, where the parties had never previously contracted with each other, the terms of the purchase order itself were still being negotiated, and both parties required BP's signature on the purchase order before the contract could become effective.

14

## II.     STANWOOD'S PROMISSORY ESTOPPEL CLAIM FAILS AS A MATTER OF LAW.

Stanwood's promissory estoppel claim fails as a matter of law because Stanwood has no contract rights to enforce as BP did not promise it would sign the purchase order.  "It is a well-established principle in Texas that 'contract rights cannot be created by estoppel [but estoppel can] prevent a party's conduct and actions from operating as a denial of the right of enforcement of a contractual obligation already created.'"  *Oliver Resources PLC v. Int'l Finance Corp.*, 62 F.3d 128, 131 (5th Cir. 1995) (bracketing phrase in original) (internal citations omitted).  Simply put, "estoppel does not affirmatively create contract rights."  *Id.* at 131, n. 5.[55]

Stanwood asserts (in a footnote to its Motion) that BP is estopped from relying on the statute of frauds defense because "Daniyal Siddiqui represented that BP would sign the Purchase Order."  (Pl's Mot. for Sum. J. at 13, n. 7.)  As evidence, however, Stanwood only cites one e-mail that was sent by Daniyal Siddiqui to Stanwood during the negotiations between the parties.[56]  And this communication is insufficient to support Plaintiff's promissory estoppel claim.  *Compare* Ex. 33 ("Please see amended purchase order.  Go ahead and sign it, get it back to me, I'll get it signed…") with *Simmons*, 286 S.W.2d at 354-55 (holding no contract existed where the offeror told the sub-contractor, "[h]e told me to take [the contract], they were in several copies, take them with me, and obtain a bond, have the contract signed, the documents signed, on behalf of our organization, place with it the bond(s) so obtained, and return it to the W.L. Rea Construction Company for signature," the sub-contractor complied, but then the offeror did not sign and instead rejected the agreement).

---

[55]  *See also Construcciones Industriales Del Golfo, S.A. de C.V. v. Searex, Inc.*, 182 F.3d 914, No. 98-20898, 1999 WL 423004, at *5 (5th Cir. May 28, 1999) (same), *citing Wheeler v. White*, 398 S.W.2d 93, 96 (Tex. 1965) ("[Promissory estoppel] does not create a contract where none existed before, but only prevents a party from insisting upon his strict legal right when it would be unjust to allow him to enforce them.  The function of the doctrine of promissory estoppel is, under our view, defensive in that it estops a promisor from denying the enforceability of the promise").

[56]  Ex. 33.

Plaintiff's citation to *"Moore" Burger, Inc. v. Phillips Petroleum Co.*, 492 S.W.2d 934 (Tex. 1972) is inapplicable.  (*See* Pl's Mot. for Sum. J. at 13, n. 7.)  In *Moore*, a city was looking to sell two land tracts.  *Id.* at 937.  The leasee of one tract—a restaurant owner—planned to place a bid to purchase the land.  *Id.*  However, another purchaser negotiated a deal with the restaurant owner whereby the owner agreed not to bid on the property, and in exchange, he would be given a 20 year lease in the new building the other purchaser was planning to build.  *Id.*

The restaurant owner drew up the agreement and took it to the purchasers who stated they "accepted the agreements, and their attorney, Kemp, who was their trustee, would sign them." *Id.* at 938.  The trustee also confirmed "the terms were all accepted by [the purchaser] and that he would sign the lease."  *Id.*  Relying on these statements, the restaurant owner did not bid on the land.  *Id.*  However, the other purchaser never intended to provide the restaurant owner with a lease, and in fact, "[t]he entire time these negotiations were going on, [the other purchaser] had a contract to sell the property to Broadway Oil company which planned to build a service station for Phillips Petroleum Company."  *Id.*  The court found this deception persuasive in its ruling. "If the evidence tendered in this case by 'Moore' Burger be accepted as true, enforcement of the statute of frauds 'would, itself, plainly amount to a fraud' on 'Moore's Burger's rights."  *Id.*

There was no such deception in this case.  Plaintiffs knew they were in negotiations for a contract that was not a certainty (*see supra*, Statement of Facts, Sec. E.), and that any action taken by Stanwood in the hope that the contract would be executed was a "business risk."[57] Stanwood's promissory estoppel claim fails as a matter of law.

---

[57]   *See* Ex. 8.

## CONCLUSION

Wherefore, BP respectfully requests that the Court:

(1)     Deny Plaintiff's Motion for Partial Summary Judgment;

(2)     Enter summary judgment in favor of BP, finding Stanwood's claims for breach of contract and promissory estoppel fail as a matter of law; and

(3)     Dismiss this lawsuit it its entirety.


Respectfully submitted,

By:  _s/   Thomas W. Taylor_____
          Thomas W. Taylor
          Texas Bar No. 19723875
          S.D. Tex. No. 3906
          Georgia L. Lucier
          Texas Bar No. 24043523

     ANDREWS KURTH
     600 Travis Street, Suite 4200
     Houston, Texas 77002
     Telephone:  713-220-4200
     Facsimile:  713-220-4285
     ttaylor@andrewskurth.com

     ATTORNEY-IN-CHARGE FOR
     DEFENDANT BP EXPLORATION AND
     PRODUCTION INC.

**OF COUNSEL**

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Wendy Bloom
300 N. LaSalle Street
Chicago, IL 60654
Telephone:  312-862-2000
Facsimile:  312-862-2200

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing instrument has been served by electronic CM/ECF filing on this 11th day of May, 2011, on all counsel of record.


_s/ Thomas W. Taylor_____
Thomas W. Taylor